**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | |
|---|---|
| B.A., G.T., P.D., D.B., J.B., E.R., C.L., M.C., M.D., V.F., J.B. | ) |
| | ) JURY TRIAL DEMANDED |
| | ) |
| **Plaintiff** | ) Case No.6:24-CV-03266 |
| | ) |
| vs. | ) |
| | ) |
| DIOCESE OF SPRINGFIELD – CAPE GIRARDEAU, BISHOP EDWARD M. RICE | ) |
| | ) |
| **Defendant** | |

## PETITION FOR DAMAGES

1.      COME NOW the Plaintiffs, B.A., G.T., P.D., J.B., E.R., C.L., M.C., M.D., V.F., J.B., ("Plaintiffs"), and for their causes of action against Defendants alleges as follows:

## NATURE OF PETITION

2.      Defendants Diocese of St. Louis ("Diocese") and Bishop Edward M. Rice in his official capacity ("Bishop") have knowingly enabled, covered up, and concealed  for multiple decades that their employees sexually abused minors.  Moreover, Defendants have covered up and concealed their own intentional misconduct in enabling this sexual abuse by exploiting the trusting and confidential relationship the Defendants encouraged and established with Plaintiffs while they were impressionable young children. This shameless cover-up spanned decades and allowed

various bishops and other employees to access and sexually abuse numerous children, including Plaintiffs, and hindered Plaintiffs from discovering their causes of action against the Defendants for their negligent and intentional conduct.

3.     Plaintiffs bring this lawsuit in order to hold the Defendants responsible for the injuries Defendants have caused and to protect other children from the pain of childhood sexual abuse.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the causes of action asserted herein and over the parties to this action.

5.     This court has jurisdiction over the causes of action asserted herein and over the parties to this action.  Plaintiffs assert claims under Missouri Common law and claims under 18 U.S.C. § 1589, 18 U.S.C. § 1591 and 18 U.S.C. § 1595 and 18 U.S.C. § 2255 as well as 42 U.S.C. § 1983.

6.     All of the acts complained of herein occurred within this judicial district, vesting this Court with subject matter jurisdiction.

7.     Venue is proper in this judicial district under one or more of the following statutes: 28 U.S.C. § 1331, 1367 and / or § 1391(b)(1).

8.     Plaintiffs assert claims under Missouri common law.  This Court has jurisdiction because Defendants Diocese and Bishop are licensed to do business or transact business in Missouri and have obtained the benefits of the laws of the State of Missouri and the benefits of the Missouri location for their parishes, schools, and other locations set forth herein.  All of the sexual molestation, harassment, abuse, and fraudulent activity described herein occurred in the State of Missouri.

## PARTIES

9. Plaintiff B.A.. is an adult resident citizen of Missouri.

10. Plaintiff G.T.. is an adult resident citizen of Missouri.

11. Plaintiff P.D.. is an adult resident citizen of Missouri.

12. Plaintiff J.B. is an adult resident citizen of Missouri.

13. Plaintiff D.B.. is an adult resident citizen of Missouri.

14. Plaintiff E.R... is an adult resident citizen of Missouri.

15. Plaintiff C.L.. is an adult resident citizen of St. Louis, Missouri.

16. Plaintiff C.M. . is an adult resident citizen of Kirkwood, Missouri.

17. Plaintiff V.F. is an adult resident citizen of Rolla, Missouri.

18. Plaintiff J.B. is an adult resident citizen of St. Louis, Missouri.

19. The Plaintiffs were minor residents of the State of Missouri at the time of the sexual abuse alleged herein.

20. Plaintiffs join their claims pursuant to Mo. R. Civ. P. 52.05 as they assert a right or rights to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence or series of transactions or occurrences and questions of law or fact common to all of them will arise in the action.

21. Plaintiffs join their claims pursuant to Fed.R.Civ.P. 19 as they assert a right or rights to relief jointly, severally or in the alternative in respect to or arising out of the same transaction, occurrence or series of transactions or occurrences and questions of law or fact common to all of the them will arise in the action.

3

22.     At all times material, Defendant Diocese (hereinafter "Diocese") was and continues to be a not-for-profit corporation doing business in Missouri with its principal place of business located at The Catholic Center, 601 S. Jefferson Ave., Springfield, MO. 65806-3107.

23.     Defendant Bishop Rice is a citizen of the State of Missouri and is the Bishop of the Roman Catholic Diocese of Springfield – Cape Girardeau in Missouri and is sued solely in his capacity as an officer, director and / or chief executive officer of the Diocese.   Given the official capacity in which he is sued, he is hereinafter referred to as "Bishop" which term encompasses all Bishops who officially supervised or failed to supervise the employee abusers set forth herein.

24.     Bishop was the supervisor of the abusers identified herein and at all times acted on behalf of or at the behest of the Diocese.

25.     All of the perpetrators of sexual abuse upon Plaintiffs as set forth below at all times acted at the behest of, in the course and scope of employment of, and under the control of the Diocese and Bishop; or, in the alternative, outside the scope of their employment and upon the premises in possession of the Diocese and upon which he is privileged to enter only as servant, or using a chattel of the Diocese and the Diocese knew or had reason to know it had the ability to control the Priest and knew or should have known of the necessity and opportunity to do so.

26.     For many decades, the Diocese has known of the sexual abuse perpetrated upon its young parishioners and children in the community by several of its employees, agents, servants, priests, reverends, brothers, nuns, teachers, chaplains, or other persons acting at the behest of, in the course and scope of employment of, and under the control of the Diocese and Bishop. Defendants often transferred the perpetrator to a different location within the Diocese and/or the Catholic Church, or sent him away for treatment before returning him to unsupervised access to

children. To the extent it published anything at all about this misconduct, the Defendants often came to the defense of the perpetrator even in the face of known sexual abuse.

27.     Father Leonard Chambers was ordained in 1965 for the Diocese of Springfield – Cape Girardeau.  He was assigned to more than twenty parishes during his career, assisting and serving as administrator early on, then assigned as pastor for the first time in 1974.  Chambers held a number of diocesan positions, serving as president or chair of several.

28.     In August, 1982, Bishop Bernard Law placed Chambers on leave after the parents of a teenage boy complained that the priest had molested their son.  Chabers admitted to the abuse. He spent ten months at the Servants of the Paraclete's treatment facility in Jemez Springs, N.M. after which he was returned to the ministry.  In the mid-1990s, Bishop Leibrecht placed restrictions on Chambers prohibiting him from being alone with minors.  When Chambers was found alone with a minor in 1998, Bishop Leibrecht forced him to retire.  Fr. Chambers was assigned to St. Mary's in Pierce City, St. Michael's in Wentworth; Sacred Heart in Webb City; St. Peter's in Joplin; Cathedral of St. Mary in Cape Girardeau; St. Joseph the Worker in Ozark; Holy Trinity in Springfield; St. Joseph's in Advance; St. Anthony's in Glennon; St. Susanne's in Mount Vernon; St. Patrick's in Greenfield; St. Francis de Sales in Lebanon; St. Elizabeth Ann Seton in Springfied; Sacred Heart in Salem; Christ the King in Bunker; St. Jude Chapel in Montauk; Our Lady of the Cove in Kimberling City; Holy Family in Shell Knob.

29.     The Diocese never told any Plaintiffs herein of its knowledge and coverup of abuse by Father Chambers and others.

30.     Fathers John Harth, Fr. Reeker, Fr. Thomas McCarthy, Fr. Thomas Reidy and

Msgr. John Westheus have abused the plaintiffs set forth herein. Despite knowledge of abuses occurring in the Diocese, the Diocese never told any Plaintiffs herein of its knowledge and coverups of abuses.

31.     Several other employees, agents, servants, clergy, and others acting at the behest of and /or under the control of the Defendants sexually abused Plaintiffs as set forth herein. Upon information and belief, the Diocese knew of and covered up the sexual abuse and deviant tendencies of not only these abusers but of the Diocese and the prior Bishops.

32.     In September 2018, the Bishop and Diocese promised to publish the names of clergy who had substantiated claims of sexual abuse of minors against them. The Bishop and Diocese failed to release the names until April 5, 2019 , when they released a list of 16 Diocesan Priests and 23 Order Priests and Priests affiliated with the area whose sexual deviance and/or abuse was substantiated.

33.     In September 2019, the Missouri Attorney General ("AG") referred 12 former clergy members for criminal prosecution as a result of sexual deviance. In its report dated September 13, 2019, the AG reported:

> For decades, faced with credible reports of abuse, the church refused to acknowledge the victims and instead focused its efforts on protecting its priests. During this time, the responsibility for evaluating and responding to reports of abuse and misconduct was controlled by a small circle of priests in diocesan leadership and the bishops.
> Lay members of the church were generally not informed of reports, much less allowed a role in dealing with them. The standard response to reports of abuse by church leadership was to move an offending priest into a short-term period of treatment and then reassign him to public ministry in a new parish. Members of an offending priest's old and new parishes were not notified of the reason for a transfer in these cases. At best, victims were offered limited counseling services to help recover from the abuse.

6

34.     Notwithstanding the Church's painfully delayed and untimely publication of substantiated abusers and the AG's exposure of the intentional conduct of the Diocese in causing this sexual abuse, the Diocese nonetheless never advised Plaintiffs, other parishioners, or community members of their intentional misconduct in enabling and ultimately perpetrating the abuse on the Plaintiffs and other children similarly situated.

## BACKGROUND FACTS APPLICABLE TO ALL COUNTS

35.     Plaintiffs adopt by reference all paragraphs of this Petition as if set forth fully herein.

36.     Plaintiffs were children at the time of the events set forth in this Petition. They did not understand and could not comprehend the actions of the those who abused them.  Moreover, they did not actually , nor could they legally consent to the abuse perpetrated by their abusers.

37.     At all times material hereto, the abusers set forth herein (collectively "Abusers") were employees, agents, or servants of and under the direct supervision and control of the Diocese and its representative the Bishop, both of whom had the right to control the Abusers. All acts of sexual abuse alleged herein took place during functions in which the Abusers had custody or control of Plaintiffs in their role as a priest or other authority figure.

38.     At all relevant times, the Diocese and Bishop did not act in any manner to protect the young children of its parishes, churches, community, and other organizations within its ambit. To the contrary, the Bishop and Diocese engaged in several decades of intentional misconduct in turning a blind eye to the sexual abuse of its priests and other employees. Instead of removing the Abusers from their employ and control and reporting the abuse to authorities as required by law, Defendants enabled and emboldened Abusers to continue perpetrating horrific conduct upon

7

Plaintiffs by giving Defendants' employees, agents, and servants unfettered access to Plaintiffs and other children by reassigning the Abusers to another parish or organization, sending Abusers away for treatment for a short time, or otherwise failing to take any remedial action whatsoever.

As a result of the actions and inactions of the Bishop and the Diocese, Plaintiffs and other children were abused.

39.     As a result of misrepresentations made by and failures to disclose of the Defendants Diocese, Bishop and the Abusers identified herein, and by virtue of the fact that Defendants held themselves out as the counselors and instructors on matters that were spiritual, moral, and ethical, Defendants had domination, custody, and influence over Plaintiffs.

40.     In addition, by accepting the care, custody and control of the minor Plaintiffs, Defendants stood in the position of an *in loco parentis* relationship with the minor Plaintiffs.  As a result of these special relationships between Plaintiffs, Defendants, and the Abusers, Plaintiffs trusted and relied upon Defendants to nurture and protect them while in Defendants' care and custody.  The power imbalance between young children and the Defendants and Abusers increased Plaintiffs' vulnerability to all Defendants and Abusers.

41.     Defendants held a position of trust and confidence in the care and supervision of Plaintiffs constituting a fiduciary and / or confidential relationship and a duty to disclose to Plaintiffs their knowledge of the sexual abuse occurring within the Diocese before and after the abuse identified herein and to disclose their own culpability in enabling and perpetrating said abuse.

42.     At the time that the Abusers had unlawful sexual contact with Plaintiffs, all Defendants falsely represented to Plaintiffs that Defendants and Abusers were providing spiritual counseling, comfort, mentorship and advice to Plaintiffs.

43.     The actions of Defendants identified herein were outrageous and utterly repugnant to a civilized society.

44.     Defendants Bishop and Diocese knew or should have known that by allowing the Abusers access to young children as part of their official duties after reports of impropriety involved an unreasonable risk of causing emotional distress to Plaintiffs and other similarly situated individuals.

45.     The actions of the Diocese and Bishop that enabled the Abusers to have access to children and hold themselves out as priests, father figures, or mentors to their parishioners and young children with whom they came into contact, were outrageous and utterly repugnant to a civilized society. All Defendants acted with depraved hearts knowing harm would occur, including the damages to Plaintiffs described herein and other similarly situated children. Defendants knew or should have known this outrageous behavior would cause emotional distress to the families of the victims and the victims, including Plaintiffs.

46.     The sexual abuse of Plaintiffs and the circumstances under which the abuse occurred, caused one or more Plaintiffs to develop various psychological coping mechanisms and symptoms of psychological distress, including repression of memory, great shame, guilt, self-blame and depression. As a result, one or more Plaintiffs were unable to know or have reason to know that they were victims of sexual abuse committed upon them by the Abusers identified herein. The sexual abuse and exploitation of the Plaintiffs and the circumstances under which it occurred caused one or more Plaintiffs to develop various psychological coping mechanisms which made them incapable of ascertaining the resulting damages from that conduct.

47.     Furthermore, upon information and belief, after learning of the wrongful conduct of Defendants and the Abusers identified herein, one, multiple, or all Plaintiffs were distinctly

9

injured for the first time or distinctly injured in addition to prior damage resulting from the actions and omissions of Defendants. Defendants individually and/or by and through its agents, ratified the wrongful conduct described herein by failing to report it to law enforcement authorities, the Plaintiffs, prospective parishioners, current parishioners, their families, victims, and the public.

48.     Defendants' conduct in concealing their own culpability communicated to Plaintiffs and other victims that Defendants' conduct was proper, and that legal action was not necessary. Defendants knew or should have known, that their actions would silence Plaintiffs and other victims, prevent them from discovering their injuries, their complaints or possible other complaints or victims, and ultimately exacerbate their emotional distress and trauma.

49.     Defendants' conduct in misrepresenting the extent to which they knew of the Abusers' conduct prior to and after the abuse described herein prevented Plaintiffs from learning that they had a cause of action against Defendants.

50.     By absconding or concealing themselves and/or by other improper acts, the Defendants Diocese and Bishop prevented the commencement of this action for many years, and in many cases several decades.

51.     Moreover, the improper acts of and concealment by the Bishop and Diocese constituted a legal hindrance to and impairment of all Plaintiffs' ability to know of or maintain a cause of action against the Diocese and Bishop.

52.     One, multiple, or all Plaintiffs never contacted an attorney, told anyone else about their abuse, or knew of their cause of action against Defendants until recently.

53.     As such, Plaintiffs' claims either did not accrue until within five years or ten years of the filing of this Petition or, in the alternative, they accrued and were tolled pursuant to the

doctrine of fraudulent concealment, repressed memory, and/or delayed discovery until within five years or ten years of the filing of this Petition.

54. Defendants therefore cannot succeed or assert any defense that Plaintiffs' action is not timely because Defendants individually and in concert with each other fraudulently concealed the wrongfulness of the conduct set forth herein and the causal relationship of the harm suffered by Plaintiff.

55. As a direct result of Defendants' wrongful conduct, Plaintiffs have suffered and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; were prevented and will continue to be prevented from performing their daily activities and obtaining the full enjoyment of life; have sustained loss of earnings and earning capacity; and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

**Sexual Abuse of B.A..**

56. B.A. was born on March 30, 1987 and lived in Kimberling City, Missouri when he was sexually abused.

57. B.A. was raised in a devout Catholic household. He attended Our Lady of the Cove Catholic Chuch, 20 Kimberling Blvd., Kimberling City, MO. He served as an altar boy, took his first communion at the Church and was involved in Church activities as a young boy.

58. Between approximately 1994 and 1998, when the boy was approximately 7-12 years of age Fr. Leonard Chambers sexually abused the boy. It began when Fr. Chambers asked the young boy to help with house cleaning and gardening after church hours. Father Chambers

asked the young child to take off his shirt. He began rubbing towels on him, fondling Plaintiff's genitals and having plaintiff touch the priest.

59.     On several occasions, Fr. Chambers gave the altar boys wine. Then, he would have one on one time with the boys where molestation would occur. These events occurred on multiple occasions over the course of approximately six years.

60.     Or Lady of the Cove was under the direct supervision, employ and control of Defendants Diocese and Bishop.

**Sexual Abuse of G.T.**

61.     G.T. was born on February 18, 1974 and attended Our Lady of the Cove Catholic Church when he was sexually abused by Fr. Chambers there. The molestation occurred while Plaintiff was changing to serve Mass as an altar boy.

62.     Father Chambers sexually abused G.T. in 1983, after allegations of abuse had already been reported to the Diocese and Bishop.

63.     Father Chambers was under the direct supervision, employ, and control of Defendants Diocese and Bishop.

64.     G.T. engaged in psychological coping mechanisms that prevented ascertainment of his injuries.

**Sexual Abuse of P.D.**

65.     P.D. was born on August 30, 1989. She lived in Wappapello, Missouri at the time of abuse.

66.     P.D. was raised by a devoutly Catholic family and was culturally Catholic with the consistent presence of Catholicism in her upbringing. She was taught that the Priest and Catholic

Church as an institution were who decided if her soul was bound for heaven. She had a deep reverence for and obedience of the Church, the Priests and the teachings.

67. P.D. attended Sacred Heart Church, 825 Vine Street, Poplar Bluff, MO.

68.     At all relevant times, Sacred Heart was under the direct supervision, employ, and Diocese and Bishop.

69.     P.D. was sexually abused by Fr. Michael McDevitt.  For a period of approximately 6 months during the late 1990s, Fr. McDevitt engaged in sexual intercourse with Plaintiff, also penetrating her digitally and fondling her.  This occurred after McDevitt offered Plaintiff wine and getting her inebriated.

**Sexual Abuse of B.D.**

70.     B.D.. was born on April 15, 1973 and attended St. Ann's Catholic Church, 304 N. Douglass Street, Malden, Missouri.

71.     St. Ann's, Malden  was at all relevant times under the direct supervision, employ, and control of Defendants Diocese and Bishop.

72.     On one occasion, a Priest whom Plaintiff has no recall of his name, touched Plaintiff's private areas then forced Plaintiff to have sex with another altar boy while the abuse watched.

73.     These events occurred on one occasion in 1985.

**Sexual Abuse of J.B.**

74.     J.B. was born on November 20, 1979 and lived in Neosho, Missouri at the time of the abuse set forth herein.

75.     J.B. attended S. Canera's Catholic Church in Neosho, Missouri, located at 1008 S. Lafayette Street, Neosho, MO. 64850.

76.     J.B. was raised in a devoutly Catholic family.  She attended church every Sunday and was confirmed and had her first communion at St. Canera's Catholic Church.

control of Defendants

77.     J.B.'s parents raised her to respect, trust, and obey the Catholic Church and its employees. She was taught by both her parents and the Church that priests were the ultimate authority and were to be trusted inherently.

78.     J.B. was an altar server for many years, beginning when she was 9 or ten years old. When Plaintiff became a teenager, Fr. Harth took an interest to her. He began taking her to the room where the altar servers got ready. When there were no other children present, Fr. Harth would kiss her, touch her breasts and genitals.

79.     On one occasion, Fr. Harth had a newspaper clipping of Plaintiff playing basketball and asked Plaintiff to come by and get a copy from him. When she arrived, he kissed her and fondled her again.

80.     These events occurred at least monthly for approximately three years.

81.     Plaintiff told her mother in approximately 2019. Her mother, who is now deceased, reported the abuse to the Diocese but no action was taken and the Diocese has never reached out to her to conduct any kind of investigation.

82.     Plaintiff engaged in psychological coping mechanisms that prevented her from ascertaining the injuries from the abuse or its wrongfulness.

**Sexual Abuse of E.R.**

83.     E.R.. was born on April 17, 1962 and lived in Neosho, Missouri at the time of abuse.

84.     E.R. was raised in a Catholic family that attended church every Sunday. Plaintiff's mother was very involved in the church and frequently volunteered. Plaintiff was baptized and received first communion at St. Canera's Catholic Church in Neosho.

85.     At all relevant times, St. Canera's was under the direct supervision, employ, and

Diocese and Bishop.

86.     Between 1968 and 1970, Plaintiff was abused on multiple occasions by Fr. Reeker and Fr. Tom McCarthy.  On those occasions, Fr. Reeker would babysit Plaintiff at the Rectory. Sometimes, fr. Reeker would bathe Plaintiff and use the occasion to molest him and fondle him. Reeker also abused him in other rooms of the rectory.

87.     Fr. McCarthy also abused Plaintiff.  Usually that would occur at McCarthy's home. There, McCarthy would bathe and fondle the plaintiff.  McCarthy also took his clothing off and required Plaintiff to fondle his genitals.  On at least one occasion, Plaintiff's parents arrived early and McCarthy and Reeker quickly dressed the boy stating that they had bathed claimant.

88.     At all relevant times, St. Canera's Catholic Church and rectory were under the direct supervision, employ, and control of Defendants Diocese and Bishop.

89.     Plaintiff told his father of the abuse early on but his father became irate and he never spoke of the abuse again.

90.     Plaintiff also told Fr. Reeker that Fr. McCarthy was abusing him but Fr. Reeker took no action.

91.     Plaintiff engaged psychological coping mechanisms that prevented him from ascertaining his injuries or their cause.

**Sexual Abuse of C.L.**

92.     C.L. was born on July 10, 1974 and lived in Springfield, Missouri, at the time of the abuse.

93.     From 1984-1987, when C.L.. was between approximately 9 and 12 years of age, C.L.  served as an altar boy.

control of Defendants

94.    Fr. Reidy was in charge of the Altar boys.  Plaintiff had known Fr. Reidy for about a year when Fr. Reidy brought him to the rectory.  There, Fr. Reidy undressed in front of the little boy then gave the plaintiff a "hand job."  Thereafter, he forced the Plaintiff to touch Reidy.

95.    These events occurred approximately monthly for a two year period.

96.    Fr. Reidy also had a visiting priest at the parish.  The visiting priest invited the little boy to the rectory and the church basement.  Plaintiff had met the visiting priest before but does not recall his name at this time.  The visiting priest forced Plaintiff to perform oral sex on him, then the priest performed oral sex on the little boy.  He also sodomized the boy.  These abuses occurred approximately three or four times with the same visiting priest.

97.    Plaintiff never told anyone about the abuse.

98.    St. Canera's Catholic Church was under the direct supervision, employ and control of Defendants Diocese and Bishop.

99.    Plaintiff engaged psychological coping mechanisms that prevented him from ascertaining his injuries or their cause.

### Sexual Abuse of M.C.

100.    M.C.. was born on January 6, 1965, and lived in a very small town in Southeast Missouri at the time of the abuse.

101.    M.C. was not raised Catholic.  He attended an overnight event with his youth group at St. Joseph's Parish in Advance, Missouri.  He woke up with the youth pastor's hand over his mouth.  He told the claimant to be quiet then proceeded to rape the boy, touching his genitals, forcing Plaintiff to touch the pastor's penis and penetrating the boy's anus.

102.    St. Joseph's parish is located at 33921 State Highway 91, Advance, Missouri.

103.    At all relevant times, St. Joseph's was under the direct supervision, employ and

           Diocese and Bishop.

104.    Plaintiff never told anyone about the abuse.

105.    Plaintiff engaged psychological coping mechanisms that prevented him from

ascertaining his injuries or their cause.

106.    Plaintiff blocked out the abuse and did not recall it until recently when the memories

began flooding back.

**Sexual Abuse of M.D.**

107.    M.D. was born on September 15, 1967 and lived in Joplin, Missouri when Msgr.

John Westheus sexually abused him.

108.    M.D. attended Catholic school and St. Mary Parish for mass on Sundays.  He served

as an altar boy for three or four years.

109.    Msgr. Westheus touched Plaintiff's genitals, performed oral sex on Plaintiff and

forced Plaintiff to perform oral sex on the Priest on approximately 8 to 10 occasions.

110.    As a child, Plaintiff told his father.  His father did not believe him and as punishment

made the boy hold a Bible out in the air until he was exhausted.

111.    After that, Plaintiff told no one.

**Sexual Abuse of V.F.**

112.    V.F. was born on January 29, 1968.  He resided in Carthage, Missouri at the time

he was abused by an unknown priest at St. Ann's in Carthage.  The Priest had an office at St.

Ann's, was heavier set, average height, older and had grey hair.

control of Defendants

113.     Plaintiff attended 8th grade at St. Ann's.  While he was there, the Priests called him a "charity case" who was at their mercy and if he broke any rule he would be suspended.  He was at St. Ann's because he had been kicked out of public school.

114.     At all relevant times, St. Ann's was under the direct supervision, employ, and control of Defendants Diocese and Bishop.

115.     The abuse occurred when the Priest called Plaintiff into his office in the rectory at St. Ann's.  There, the priest pulled down Plaintiff's pants, fondled and Plaintiff and tried to force Plaintiff to touch him.  The Priest also demanded oral sex and performed oral sex on the boy.

116.     These abuses occurred approximately 10-12 times over the course of that school year.

117.     Plaintiff never told anyone of the abuse.

**Sexual Abuse of J.B.2.**

118.     J.B.2. lives in West Plains, Missouri and was abused at a St. Genevieve Parish when she was approximately five to six years old.  Plaintiff does not recall the name of the deacon who abused her but she describes him as Caucasian, in his sixties, average height, overweight, balding and with glasses.

119.     This priest required the little girl to touch him and he touched her vagina.

### CAUSES OF ACTION

### COUNT I – Intentional Failure to Supervise Clergy

120.     Plaintiff incorporates all paragraphs of this Petition as if fully set forth herein.

121.     At all times material, Defendant Diocese through Bishop and his designees, was the supervisor and employer of the Abusers.

122. The Abusers, enabled by their employment with Defendants who at all relevant times had the right to control the Abusers, engaged in actions that were known by the Diocese and Bishop. Said actions were matters over which the Diocese had both the power and the duty to control.

123. Defendants were aware of previous sexual misconduct by clergy within its boundaries, including the Abusers, and that future harm was certain or substantially certain to result without proper supervision and disregarded this known risk. Defendants Diocese caused one or more Abusers to be transferred from earlier assignments because of inappropriate touching of young boys and girls.

124. The Defendants subjected themselves to liability by retaining in their employ servants who, to their knowledge, were in the habit of misconducting themselves in a manner dangerous to others.

125. Upon information and belief, the Bishop and his designees as the Chief Executive Officer of the Diocese was a supervisor of the Abusers, all of whom worked for and, under the auspices of or the apparent authority of the Diocese.

126. The Bishop and his designees, including the Priests of the Diocese, had the duty to report to the Diocese unethical and/or inappropriate behavior of others including other priests.

127. The Bishop and the Diocese each had the duty to report to the police, Department of Social Services or the proper legal authorities, suspicions that the children who came into contact with the Abusers might be abused.

128.     The Bishop and Diocese each had the duty to report to the police, Department of Social Services or the proper legal authorities, its suspicions that children who came into contact with the Abusers might be abused.

129.     The Bishop and Diocese each failed in their duties to supervise the actions of the other by failing to report the sexual misconduct they observed and/or of which they had notice.

130.     Each of the Defendants disregarded the known risk of sexual abuse.

131.     Defendants' actions and inactions caused injury to Plaintiffs.

132.     One or more Plaintiffs were sexually abused on the property owned and operated by Defendant Diocese and/or was abused on premises that the Abusers were allowed on solely due to their status as priests or employees, servants, or agents of the Diocese.

133.     Defendants Bishop and Diocese knew or should have known that inappropriate touching of young children by their employees and/or designated agents would cause or was substantially certain to cause those children harm.

134.     Despite the risk posed by the Abusers, Defendants continued to place them in positions in which they would have daily contact with children.

135.     Despite the risk posed by the Abusers, Defendant Diocese and Defendant Bishop ratified the actions of being alone with small children by approving and paying for travel expenses and other expenses associated with outings with children.

136.     By engaging in these actions, Defendant Diocese and Bishop disregarded the risk posed by the Abusers to these children.

137.     All Defendants' actions and/or inactions were willful, wanton and reckless for which punitive damages and/or damages for aggravating circumstances are appropriate.

138.     As a result of Defendant Diocese's and Bishop's failures to properly supervise, Plaintiffs were injured and have suffered, and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress that are medically diagnosable and significant, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; were prevented and will continue to be prevented from performing their daily activities and obtaining the full enjoyment of life; have sustained loss of earnings and earning capacity; and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## COUNT II – Negligent Failure to Supervise Children  and report sexual abuse

139.     Plaintiffs incorporate the foregoing paragraphs of this Petition as if fully set forth herein.

140.     Defendants had a duty to protect children served by their churches from known risks of harm and pursuant to Mo. Rev. Stat. Ann. § 210.115, to report sexual abuse of minors.

141.     As set forth herein, since Defendants knew that the Abusers had a propensity to sexually abuse minors, the injuries inflicted upon Plaintiffs were foreseeable.

142.     Defendants, by and through their agents, servants and employees, knew or reasonably should have known of the Abusers' dangerous propensities to sexually violate children. 143. Defendants had a duty to protect children commensurate with the risk of harm.

144.     Since Defendants knew many of the Abusers were predators, Defendants had reasonable cause to believe that Plaintiffs were being sexually abused.

145.     Defendants breached their duty to protect Plaintiffs when they failed to supervise them, placing them with  known predators.

146.    One or more of the Plaintiffs' memories of the sexual abuse described herein were repressed.

147.    As a direct result of defendants' wrongful conduct, Plaintiffs memories were repressed and have suffered and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; were prevented and will continue to be prevented from performing their daily activities and obtaining the full enjoyment of life; and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## COUNT III – Breach of Special Relationship/Duty

148.    Plaintiffs incorporate all paragraphs of this Petition as if fully set forth herein.

149.    As set forth herein, since Defendants knew that the Abusers had a  propensity to sexually abuse minors, the injuries inflicted upon Plaintiffs were foreseeable.

150.    As a result of Plaintiffs being minors at the time of the sexual abuse, and by Defendants undertaking the care and guidance of the then-minor, vulnerable Plaintiffs, Defendants held a position of empowerment over Plaintiffs.

151.    Defendants, by holding out themselves, the parishes and religious institutions at which the Abusers served, as safe and secure institutions and holding themselves out as shepherds and leaders of the Roman Catholic Church, solicited and/or accepted this position of empowerment.  Defendants entered into a special, confidential, custodial, and/or fiduciary relationship with Plaintiffs.

23

152.     Plaintiffs reposed trust and confidence in all Defendants as their spiritual guides, authority figures, teachers, mentors and confidantes.

153.     As a fiduciary or confidante to Plaintiffs, Defendants had a duty to obtain and disclose information relating to sexual misconduct and other inappropriate behavior of Defendants' agents, including Abusers.  As their caretaker, confidante and fiduciary, each Individual Defendant owed Plaintiffs the duty of trust and loyalty, and the duty to work solely for their benefit.  Moreover, Defendants had a duty to disclose to Plaintiffs and others the wrongful nature of the abuse.

154.     Defendant Diocese breached its duties to Plaintiffs and abused its position of trust and confidence for its own personal gain, including without limitation, the following:

a.   Defendants used Plaintiffs' dependency and innocence as a child to prevent them from recognizing that the abuse was wrongful and threatened their security, their parents' love, and their everlasting soul if they told anyone of the abuse;

b.   Defendants accomplished this end by enforcing the secrecy around the acts and/or by teaching Plaintiffs that the acts were normal or necessary to the relationship;

c.   Keeping known pedophiles in the presence of children such that they would be allowed to molest Plaintiffs;

d.   Hiding the fact of the previous abuse from any individuals who might intervene including parents, state authorities, parishes, and parishioners;

e.   Failing to provide a safe environment for the children who relied upon them for their care, nurturance and support;

f.  Violating their duties of care imposed by their status as in loco parentis to the children over whom they exercised dominion and control;

g.  Failing to abide by their own internal, secular policies and procedures concerning removal, sanction, or discipline of their agents and employees, knowing the individuals whom they serve rely upon those rules, policies and procedures;

h.  Ratifying the abuse by Abusers by continuing to pay their travel expenses, allowing outings with and access to children including Plaintiffs to continue, and hiding the fact of their abuse from other individuals or organizations that might intervene to protect the children under their care, custody and/or control after reports of abuse were made.

i.  Failing to warn Plaintiffs' families of the possibility of sexual abuse.

155.  Defendant Bishop breached his duties to Plaintiffs and abused his position of trust and confidence for his own personal gain and advancement, including without limitation, the following:

a.  The Diocese and its employees, servants, and agents knew that individual priests and other employees were having inappropriate physical contact with children.

b.  During therapy ordered by the Bishop and/or Diocese, one or more Abusers admitted to being sexually attracted to children.

c.  Even while still in therapy, one or more Abusers began sexually abusing other children.

d.  Despite extensive knowledge of abuse by the Abusers, the St. Louis Diocese did not remove them from ministry promptly or at all.

e. After allegations of abuse became known to the Diocese about one or more Abusers, they were sent away for treatment, the Diocese and/or Bishop placed or continued to place them at an Diocese-sponsored ministry with access to children.

f. Defendants enforced secrecy around sexual improprieties of one or more Abusers by placing the reputation of the Church over the safety of the children.

g. After certain allegations were released about certain Abusers, the Diocese released statements suggesting that the Abusers were innocent of wrongdoing despite criminal convictions and other indicia of reliability of the accusations.

h. At all relevant times, Defendant Bishop and Diocese were mandated reporters under Missouri law. Defendants Diocese and Bishop did not report the Abusers' sexual improprieties to the appropriate authorities after receiving reasonable suspicion that one or more of them may abuse children.

i. Defendant's actions in failing to report were part of an ongoing fraudulent scheme to prevent parishioners, children and the public from knowing that one or more Abusers were predators.

j. Defendant kept more than one pedophile in the presence of children such that they would be allowed to molest one or more Plaintiffs.

k. One or more Abusers were eventually prosecuted for their crimes in perpetrating sodomy and other sexually deviant acts on young children. Representatives of the Diocese, in fact, sent letters of support to the Prosecutor seeking leniency for one or more Abusers, often after knowing for years that one or more Defendants had been abusing children. These acts were in furtherance of a fraudulent scheme to

26

prevent parishioners, children and the public from knowing that one or more Abusers were known predators.

l.  Defendants hid the fact of the previous abuse from any individuals that might intervene including parents, state authorities, parishes, and parishioners by falsely, often by representing that one or more Abusers were individuals of character and safe to be with children at the same time that it received reports of abuse, sent one or more Abusers to counseling and treatment, then returned them to ministry and access to children, made misleading statements to the press with the intention that the public would be duped, failed to report actions to the proper authorities even though they were mandated reporters, and tried to influence the prosecution of one or more Abusers.

m.  Defendants failed to provide a safe environment for the children who relied upon them for their care, nurture and support.

n.  Defendants failed to warn Plaintiffs' families of the possibility of sexual abuse.

156.  Defendants violated their dutyof care  and duty to warn imposed by their status as in loco parentis to the children over whom they exercised dominion and control. Defendant Diocese failed to abide by its own internal, secular policies and procedures concerning removal, sanction or discipline of their agents and employees, knowing the individuals whom they serve rely upon those rules, policies and procedures.

157.  Defendant Bishop ratified the abuse by the Abusers by continuing to place one or more of them in parishes even after receiving multiple reports of sexual misconduct, sending one

27

or more of them to treatment by placing them at other ministries and schools, paying travel expenses, allowing outings with and access to children including Plaintiffs to continue, moving them from parish to parish and hiding the fact of the abuse from other individuals or organizations that might intervene to protect the children under their care, custody and/or control after reports of abuse were made.

158.    Abusers breached their fiduciary duties to Plaintiffs and abused their position of trust and confidence for their own personal gain, including without limitation, the

    a.    Engaging in sexual misconduct with the Plaintiffs;

    b.    Representing to one or more Plaintiffs that the actions were appropriate and were part of their spiritual growth and counseling;

    c.    Making sexual contact an implicit and/or explicit condition to the continuance of care, nurture, support and spiritual guidance.

159.    Silencing the children abused by threatening them, making them live in secret shame, fear and degradation while then ministering to them psychologically, emotionally and spiritually.

160.    Defendants' actions and/or inactions were willful, wanton and reckless for which punitive damages and/or damages for aggravating circumstances are appropriate.

161.    As a direct result of Defendants' breach of their duties and special relationship with Plaintiffs, Plaintiffs have suffered, and continue to suffer great pain of mind and body, repressed memories, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have been prevented and will continue to be prevented from performing his daily activities and obtaining the

full enjoyment of life; have sustained loss of earnings and earning capacity; and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## COUNT IV – Fraud and Conspiracy to Commit Fraud

162.    Plaintiffs incorporate all paragraphs of this Petition as if fully set forth herein.

163.    Defendants Bishop and Diocese knew or should have known of the sexual misconduct and other inappropriate behavior of their agents, including Abusers as described herein.

164.    Defendants engaged in trickery, deceit and acts of deluding Plaintiffs and those who were in a position to act on Plaintiffs' behalf while they were minors.

165.    Defendants misrepresented, concealed or failed to disclose information relating to sexual misconduct of their agents, including engaging in willful acts intended to deceive as set forth herein.

166.    At all relevant times, Defendant Bishop and Diocese were mandated reporters under Missouri law.  Defendants Diocese and Bishop did not report Abusers' sexual improprieties to the appropriate authorities after receiving reasonable suspicion that they may abuse children.

167.    Defendant's actions in failing to report were part of an ongoing fraudulent scheme to prevent parishioners, children and the public from knowing that one or more Abusers were predators.

168.    Defendants kept one or more known pedophiles in the presence of children such that they would be allowed and enabled to molest Plaintiffs.

169.    Defendants Diocese and Bishop maintained publicly that the Priests of the Diocese were appropriate, well-trained and men of excellent character who were above reproach and safe role models who nurtured, trained, and formed the character of children.

170.    Defendants Diocese and Bishop expressly and impliedly made these representations.

171.    At the time that these representations were made, the Diocese and Bishop had a pattern and practice of sending priests who had abused children to the Servants of the Paraclete or other treatment facilities for perpetrating and sexually deviant priests, then returning them to ministry, including ministry with children.

172.    The Diocese and Bishop had a pattern and practice of moving perpetrating priests from location to location to protect the perpetrating priests from criminal penalties and civil lawsuits.

173.    Although the Diocese and Bishop owed the children and parents of the Diocese duties commensurate with their position, the Diocese and Bishop kept from the parents information concerning the Abusers that would affect their decisions regarding whether to allow their children to be alone with them, including information that one or more Abusers were known to abuse children.

174.    In the face of the special knowledge that the Diocese and Bishop had as well as the special relationship they had with the parishioners and children of the Diocese, the Diocese and Bishop refused to provide information to parishioners and their children about the hidden dangers that were posed by one or more Abusers.

175. Defendants Diocese and Bishop intentionally represented that Abusers were fit for the ministry including his ministry with children, even after having actual knowledge that they exhibited paraphilia and engaged in boundary violations with children.

176. Defendant Diocese and Bishop followed a policy that hampered investigation into allegations of sexual misconduct by its priests.

177. Defendant Diocese and Bishop failed or refused to take reports by parishioners and even employees of the abuses of one or more Abusers, even after publishing a website encouraging parishioners to come forward if they have allegations of sexual abuse.

178. Defendant Diocese ignored reports that the Abusers were engaging in inappropriate sexual activity with children.

179. Defendant Diocese and Bishop deliberately failed to warn or inform Parishioners, family members or any other individuals or organizations about Abusers using their children for their own sexual gratification, instead encouraging parishioners, including the small children, to maintain relationships with them.

180. Defendants deliberately misled its parishioners and the public in its communications regarding one or more Abusers.

181. Defendant Diocese and Bishop hid the abuses of Abusers preventing investigation into them and covering up the allegations, making them accessories before, during and after the fact in the following particulars without limitation:

 a. Failing to provide a safe environment for the children who relied upon them for their care, nurturance and support;

b. Violating their duties of care imposed by their status as in loco parentis to the children over whom they exercised dominion and control;

c. Failing to abide by their own internal, secular policies and procedures concerning removal, sanction or discipline of their agents and employees, knowing the individuals whom they serve rely upon those rules, policies and procedures;

d. Ratifying the abuse by Abusers by continuing to employ and support them and granting them unfettered access to children, giving them positions requiring supervisory duty over children, moving them from posting to posting to avoid being "caught" abusing children, giving them positions requiring their contact with children after having gained actual knowledge that they had a propensity to abuse children and failing to report and/or hiding the fact of his abuse from other individuals or organizations that might intervene to protect the children under their care, custody and/or control.

182. Defendants knew that they misrepresented, concealed, or failed to disclose information they had the duty to disclose relating to sexual misconduct of its agent.

183. Defendants had superior knowledge or information not within the fair and reasonable reach of Plaintiffs and failed to disclose that information.

184. Defendants knew of the existence of the torts of sexual abuse and failure to supervise.

185. Defendants used deception to conceal these torts from Plaintiffs and those who were in a position to act on behalf of Plaintiffs while they were minor.

186.     Plaintiffs relied upon that deception and concealment, remaining ignorant that torts were committed upon them.

187.     The fact that Abusers had in the past and/or would in the future be likely to commit sexual misconduct with another minor was a material fact that, if known, would have influenced Plaintiffs and their family's decision whether to allow them to attend and participate in activities at church and with Defendants' agent in church sanctioned and/or sponsored activities.

188.     Upon information and belief, Defendants, in concert with each other, with the intent to conceal and defraud, conspired and came to a meeting of the minds whereby they would misrepresent, conceal, and fail to disclose information relating to the sexual misconduct of Abusers, prohibiting public scrutiny or investigation into their acts of sexual misconduct.

189.     By so concealing, Defendants committed at least one act in furtherance of the conspiracy.

190.     Defendants' actions and/or inactions were willful, wanton and reckless for which punitive damages and/or damages for aggravating circumstances are appropriate.

191.     As a direct result of Defendants' fraud and conspiracy, Plaintiffs have suffered, and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have been prevented and will continue to be prevented from performing their daily activities and obtaining the full enjoyment of life; and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

**COUNT V – Fraudulent Misrepresentation**

192.     Plaintiffs incorporate the foregoing paragraphs of this Petition as if fully set forth herein.

193.     Defendants Diocese and Bishop engaged in ongoing misrepresentation regarding the status of Abusers.

194.     The Defendant Diocese by and through its agents and administrators, represented that Abusers were priests or other officials with whom children could be trusted. The Defendants engaged in fraudulent misrepresentations as set forth herein.

195.     At all relevant times, Defendants Bishop and Diocese were mandated reporters under Missouri law. Defendants Diocese and Bishop did not report Abusers' sexual improprieties to the appropriate authorities after receiving reasonable suspicion that Abusers may abuse children.

196.     Defendants' actions in failing to report were part of an ongoing fraudulent scheme to prevent parishioners, children and the public from knowing that Abusers were predators.

197.     Defendants kept one or more known pedophiles in the presence of children such that they would be allowed to molest Plaintiffs.

198.     Defendants hid the fact of the previous abuse from any individuals that might intervene including parents, state authorities, parishes, and parishioners by falsely representing that one or more Abusers were individuals of character and safe to be with children at the same time that it received reports of abuse, sent one or more Abusers to counseling and treatment then returned them to the ministry, made misleading statements to the press with the intention that the public would be duped, failed to report Abusers' actions to the proper authorities even though they were mandated reporters, and tried to influence the prosecution of one or more Abusers.

199.    Defendants failed to provide a safe environment for the children who relied upon them for their care, nurture and support.

200.    Defendant Bishop ratified the abuse by the Abusers by continuing to place one or more of them in parishes even after receiving multiple reports of sexual misconduct, sending one or more of them to treatment by placing them at other ministries and schools, paying travel expenses, allowing outings with and access to children including Plaintiffs to continue, moving them from parish to parish and hiding the fact of the abuse from other individuals or organizations that might intervene to protect the children under their care, custody and/or control after reports of abuse were made.

201.    Defendants continued to hold the Abusers out to the community of the faithful and its parishioners as safe, secure parish priests and mentors.

202.    Abusers, by holding themselves out as priests and other officials in good standing, falsely represented to the Plaintiffs that they intended to help, protect and instruct them.

203.    One or more Abusers, by indicating the abuse was part of spiritual counseling, mentoring and advice, falsely represented to the Plaintiffs that the acts in which they engaged were part of God's will and plan and for the Plaintiffs.

204.    One or more Abusers, by telling Plaintiffs that they would lose their church, family, and soul (and other such coercive, fraudulent misrepresentations) if they told of the actions that occurred in the sacristy and elsewhere, defrauded the plaintiff.

205.    All Defendants knew such statements were false at the time they were made.

206.    The Diocese and Bishop intentionally hid from parents and others that one or more Abusers had abused children in the past.

35

207. Plaintiffs believed the statements so made by defendants were true and reasonably relied, to their detriment, upon them. They moreover capitulated to the very trust in the Diocese and Abusers instilled in them by their families and all Defendants such that Defendants' silence constituted fraud.

208. As a result of Defendants' fraudulent misrepresentations, Plaintiffs have been injured. Each and every one of his injuries caused by the sexual abuse by defendants has been exacerbated by this additional violation of the plaintiff's trust.

209. Defendants' actions and/or inactions were willful, wanton and reckless for which punitive damages are appropriate.

210. The fact that Defendants' agents, including Abusers had in the past and/or would in the future be likely to commit sexual misconduct with minors at the parish to which he was assigned would have been a material fact in Plaintiffs and their families' decisions whether to associate with the Abusers.

211. Plaintiffs justifiably relied upon Defendants for information relating to sexual misconduct of Defendants and their agents. Plaintiffs further relied upon Defendants to ensure their safety while in the Defendants' care and custody.

212. As a direct result of Defendants' wrongful conduct, Plaintiffs have suffered and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have been prevented and will continue to be prevented from performing their daily activities and obtaining the full enjoyment of life; and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

213.    Plaintiffs incorporates all paragraphs of this Petition as if fully set forth herein.

214.    Defendants Diocese and Bishop, by holding Abusers out as a reliable, trustworthy shepherd, representative, and leader of the Roman Catholic Church, solicited and/or accepted a position of power.  This position of trust prevented the Plaintiffs or those in charge of their safety from effectively protecting them and Defendants thus entered into fiduciary and/or confidential relationships with Plaintiffs.

215.    As fiduciaries and/or confidantes to Plaintiffs, Defendants had a duty to obtain and disclose information relating to sexual misconduct and other inappropriate behavior of Defendant agents.

216.    Defendant had prior knowledge of past allegations of abuse and/or sexual impropriety with children involving some or all Abusers.

217.    Defendants had a duty to protect Plaintiffs and others from known perpetrators by warning them and others of the abuse, abusive propensities, and/or preventing Abusers from accessing young children in their role with the Church.

218.    Defendants failed to disclose information regarding Abusers' abusive tendencies and history of inappropriate and sexually abusive relationships with children, or to prevent the priests from unfettered access to children.

219.    Defendants failed to disclose their knowledge of Abusers' history of using their position as priest and counselor, the church properties, and the church resources and status to attract and gain access to unsupervised time with children.

220.    Defendants actively represented that some or all Abusers were capable counselors, brothers, priests, and mentors when they knew some or all Abusers had a propensity to sexually abuse children in the past.

221.    Defendants actively developed a plan and a strategy for keeping Abusers' abusive tendencies away from public light, a plan which included:

    a.  Misrepresenting the safety of leaving a child alone with Abusers;

    b.  Failing to warn Plaintiffs of the propensity of the Abusers to sexually abuse children;

    c.  Moving some or all Abusers from parish to parish following reports of sexual misconduct;

    d.  Failing to report any of the Abusers' sexual misconduct or other behaviors involving minors to law enforcement or state authorities.

    e.  Aiding and abetting Abusers' abuse;

    f.  Encouraging one or more Abusers to sexually abuse the Plaintiffs;

    g.  Failing to take any action to stop the abuse it knew was occurring;

    h.  Failing to provide a safe environment for the children who relied upon them for their care, nurturance and support

    i.  Violating its duties of care imposed by its status as *in loco parentis* to the children over whom it exercised dominion and control and the parents who entrusted their most precious possessions, their children;

    j.  Enforcing the secrecy around the acts and/or teaching Plaintiffs that the acts were normal or necessary to the relationship;

k.  Hiding the fact of the previous abuse from any individuals that might intervene, including parents, state authorities, parishes and parishioners;

l.  Failing to abide by its own internal, secular policies and procedures concerning removal, sanction, or discipline of their agents and employees, knowing the individuals whom they serve rely upon those rules, policies and procedures;

m.  Failing to abide by its own internal, secular policies and procedures concerning investigation and/or reporting of their agents and employees, knowing that the individuals whom they serve rely upon those rules, policies and procedures;

n.  Representing that the Abusers were clergy or other agents of the Diocese in good standing.

222.  Plaintiffs justifiably relied upon Defendants for information relating to sexual misconduct of Defendants' agents.  Plaintiffs and their families further relied upon defendants to ensure the safety of children in the Defendants' care and custody.

223.  Defendants' actions and/or inactions were willful, wanton, and reckless such that punitive damages are appropriate.

224.  As a direct result of Defendants' wrongful conduct, Plaintiffs have suffered and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; and will continue to be prevented from performing their daily activities and obtaining the full enjoyment of life; and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

39

## COUNT VII– Intentional Infliction of Emotional Distress

225.    Plaintiffs incorporate all paragraphs of this Petition as if fully set forth herein.

226.    Defendants intentionally failed to supervise, remove or otherwise sanction some or all Abusers after they had actual notice of their dangerous propensities to abuse children and continued to place them in positions of authority over children and adolescents, including Plaintiffs.

227.    Defendants knew that Abusers were unsuitable for the positions they held.

228.    Defendants intentionally turned a blind eye to misconduct directed at children.

229.    Defendants intentionally failed to confront, remove, or sanction Abusers about known irregularities in employment.

230.    Defendants failed to act upon information gained during the course of their supervision of Abusers.

231.    Defendants intentionally failed to supervise the children within their care, custody or control from coming in contact with the known risk presented by Abusers.

232.    At all times relevant, Defendant Diocese was in a fiduciary and/or confidential relationship with Plaintiffs.  Instead of acting in the best interest of Plaintiffs, as required when one is in a fiduciary status, Defendant Diocese held out the Abusers with known histories of child sexual abuse as appropriate individuals with whom Plaintiffs should interact.

233.    Defendants Diocese and Bishop allowed and/or encouraged its agents to turn a blind eye toward sexual abuse of minors in furtherance of its policy of covering up these crimes.

234.    At all times relevant, Defendant Diocese and Bishop engaged in extreme and outrageous conduct, intended to cause or committed in reckless disregard of the probability of causing emotional distress and harm.

235. Defendants Diocese and Bishop engaged in unconscionable, outrageous conduct beyond all possible bounds of decency and utterly intolerable in a civilized society. Defendants' conduct caused Plaintiffs severe emotional distress of such a nature that no reasonable person in a civilized society could be expected to endure it.

236. Defendants' actions and/or inactions were willful, wanton and reckless for which punitive damages and/or damages for aggravating circumstances are appropriate.

237. Plaintiffs suffered medically significant and diagnosable distress as a result of Defendants' actions as set forth in the Background Facts Applicable to All Counts.

238. As a result of the above-described conduct, Plaintiffs have suffered, and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress that is medically diagnosable and significant, embarrassment, loss of selfesteem, disgrace, humiliation, and loss of enjoyment of life; have been prevented and will continue to be prevented from performing their daily activities and obtaining the full enjoyment of life; have sustained loss of earnings and earning capacity; and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## COUNT VIII –Aiding and Abetting / Ratification

239. Plaintiffs incorporate all paragraphs of this petition as if set forth fully herein.

240. The Diocese and Bishop at all relevant times had the right to control the Abusers As set forth herein.

241. Furthermore, the Diocese and Bishop at all relevant times countenanced, approved, aided, abetted, and encouraged as principal the tortious acts of its employees (the Abusers and John Doe I), of committing sexual abuse and battery, intentional infliction of emotional distress, breach

of special relationship and fiduciary duty, fraud, fraudulent misrepresentation, constructive fraud, and intentional infliction of emotional distress.

242.    The Diocese and Bishop ratified the actions of the abusers herein by encouraging, and / or standing by when it had actual knowledge of danger to the children by the Priest's actions but instead chose to reap financial and other benefits over the safety of its children.

243.    The Diocese and Bishop are vicariously liable for all wrongful acts and omissions of the Abusers and John Doe I set forth herein.

**COUNT IX: Action under 18 U.S.C. § 1581 *et seq.***

244.    Plaintiff incorporates all paragraphs of this Petition heretofore pleaded as if fully set forth herein.

245.    The Diocese, the Bishop, th abusers and the parishes of the Diocese engaged in activities that affected interstate commerce, including transporting of students across state lines, advertising and/or soliciting students via the internet, conferences, direct advertising, and other means across state lines and otherwise engaging in activities that affect interstate commerce.

246.    All of the Defendants named in this count acted in reckless disregard of the fact that the joint adventure engaged in the performance of abusive acts on the plaintiffs by means of force, threats of force, and/or coercion.

247.    Defendants all received benefits of value from participating in the joint venture in which sexual abuse and trafficking in persons occurred. Each Defendant acted knowingly or in reckless disregard of the fact that the venture engaged in these violations.

248.    Defendants knew or should have known that each individual abuser was engaging in acts in violation of 18 U.S.C. § 1581 *et seq.* as part of their joint venture.

249.     As a direct result of Defendants' wrongful conduct, Plaintiff suffered great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has sustained loss of earnings and earning capacity; and/or has incurred expenses for medical and psychological treatment, therapy, and counseling.

250.     Defendants actions as heretofore set forth constitute willful, wanton, and/or reckless conduct.    Said willful, wanton and/or reckless conduct constitutes aggravating circumstances justifying punitive damages in this matter.

## JURY TRIAL DEMANDED

251.     Plaintiffs demand a trial by jury on all issues triable in this case.

## PRAYER FOR RELIEF

252.     WHEREFORE, Plaintiff asks that this Court award judgment against Defendants as follows: Awarding compensatory, statutory, punitive and any and all damages as allowed by law in favor of Plaintiffs against Defendants for damages sustained as a result of the wrongdoings of Defendants, together with interest thereon; Awarding Plaintiffs their costs and expenses incurred in this action.

253.     Granting such other and further relief as the Court deems appropriate and just.

Respectfully Submitted,


*/s/Rebecca M. Randles*
**RANDLES MATA, LLC**
/s/ Rebecca M. Randles
Rebecca M. Randles, Missouri Bar #40149
851 NW 45TH STREET, SUITE 310
KANSAS CITY

(816) 931-9901 (816)
931-0134 (Fax)
rebecca@randlesmatalaw.com
ATTORNEY FOR PLAINTIFFS

Case 6:24-cv-03266-DPR   Document 2   Filed 09/13/24   Page 44 of 44